397 So.2d 442 (1981)
Salem DANDASHI and Mansham Dandashi, His Wife, Appellants,
v.
Jay B. FINE, M.D., and Mark Gordon, M.D., Appellees.
No. 80-340.
District Court of Appeal of Florida, Third District.
April 28, 1981.
*443 Brumer, Cohen, Logan, Kandell & Redlus, Daniels & Hicks and Sam Daniels, Miami, for appellants.
Lanza, Sevier & Womack, Coral Gables, Blackwell, Walker, Gray, Powers, Flick & Hoehl and James C. Blecke, Miami, for appellees.
Before HENDRY, NESBITT and FERGUSON, JJ.
FERGUSON, Judge.
Appellant Salem Dandashi, a fifty-seven year old carpenter suffered skull fractures on February 4, 1977 when struck in the face with a hammer wielded by a co-employee. On February 9, 1977, appellee, Dr. Jay Fine, assisted by appellee, Dr. Mark Gordon, performed surgery on Dandashi to repair a fracture of the orbital floor of his left eye. Shortly after he awoke from surgery on the night of February 9, 1977, Dandashi discovered that he had no vision in the left eye. He brought this malpractice action against the doctors. After hearing all the evidence, the trial court directed a verdict for Dr. Gordon on all issues and directed a verdict for Dr. Fine on the claim under the Florida Medical Consent law. A jury found Dr. Fine not negligent on the remaining issue.
Dandashi raises four issues by this appeal, (1) exclusion of the testimony of Dr. Tenzel, an expert witness, was reversible error, (2) the exclusion of the deposition testimony of Dr. Ballantyne, an expert witness, was reversible error, (3) directing of a verdict on the issue of informed consent to the surgery was reversible error, (4) directing of a verdict for Dr. Gordon was reversible error.
Dr. Tenzel was listed as an expert witness for the appellants. He called the appellee, Dr. Fine, went to lunch with him, and discussed the case. There is no dispute that this was done without the knowledge of appellants' counsel. The trial court ruled that Dr. Tenzel would not be permitted to testify. When appellants' counsel moved to make a proffer of the excluded testimony the court ruled the "motion to proffer is denied." Appellees have directed us to other discussions in the record where the court allows appellants to place "anything else" or "something else" into the trial record, however, there is no showing that the court intended to reverse its emphatic prior ruling denying the motion to proffer. The exclusion of Dr. Tenzel's testimony is not justified by anything of record and we are unaware of any authority in this state for exclusion of the testimony of an expert witness because that witness, without the knowledge of counsel, has discussed the case with the opposing party, who is also an expert.
*444 The same issue was presented to the New Jersey appellate court in Reilley v. Keswani, 137 N.J. Super. 533, 350 A.2d 74 (1975). The court there held:
Fundamental to, if not the sole purpose of, the administration of our system of justice is the search for truth...
True, DR 7-104(A)(1) proscribes an attorney for one party from communicating or causing another to communicate concerning the matters in controversy with another party he knows to be represented by counsel, without the prior consent of counsel for the other party ...
Absent a violation of DR 7-104(A)(1), it was improper to bar Dr. Diamond as a witness and to preclude him from any further participation in the case ... and to suppress his report ...
Dr. Diamond is entitled to participate in this cause to the fullest extent ... on all aspects of the case within his knowledge and expertise, including all matters founded directly or indirectly upon his discussion with Dr. Keswani.
The attempt by appellees to distinguish Reilley, supra, fails to persuade. Emphasis in that case was on the quest for truth and whether the plaintiffs or their counsel had engaged in any impropriety. The admissibility of the testimony didn't turn on the relationship of the doctor to the plaintiff. We think Reilley, supra, was correctly decided.
That the record was supplemented with a discovery deposition of Dr. Tenzel does not cure the error of exclusion. It was a discovery deposition taken by defense counsel with no cross-examination by plaintiff. From such a deposition we cannot conclude what evidence Dandashi would have presented through the witness. What is quite apparent, however, is that Dr. Tenzel's testimony was important to appellants' case.[1]
The entire deposition testimony of Dr. Ballantyne was excluded by the trial court on the grounds, as asserted by defendants, that the hypothetical questions presented consisted of "res ipsa opinion," "without a proper predicate," and called for "speculative" answers. We have examined the record and conclude that most of the objections raised were vague and without merit.
Dr. Ballantyne is a plastic surgeon who has performed approximately thirty-six procedures to repair orbital floor fractures and has been responsible for well over six hundred such operations at Roosevelt Hospital in New York City. The following colloquy appears early in the deposition:
Q. Doctor, I have requested that you review certain records, depositions, x-rays, including hospital records,[2] x-rays and depositions of Dr. Fine and Dr. Gordon in relation to their care and treatment of one Salem Dandashi.
Have you done so?
A. Yes.
Q. Doctor, let me give you a hypothetical situation and then I will ask you some questions concerning that hypothetical.
Assume that Salem Dandashi is 57 years old and he suffered facial injuries of the left malar and orb. Prior to a surgical repair he had 20/20 vision in the left eye, he had full motility, no double vision, no enopthalmos, no muscle entrapment. But after surgery, following surgery that involved an open internal fixation of the left malar orbital floor fracture and silastic implant in the orbital floor, and further assume that upon recovery, Salem Dandashi had lost all vision in his left eye, but the eyeball itself retained normal internal pressure.
Based on this hypothetical, do you have an opinion based on reasonable medical probability as to why Salem Dandashi lost vision in his left eye?

*445 MR. LARKIN [attorney for defendant Mark Gordon]: Let me object to the form of the question in that it leaves out essential facts and appears to be simply asking the witness to give a medical opinion in the form of a res ipsa.
Q. You may answer.
MR. WOMACK [attorney for defendant Jay B. Fine]: Same objection on behalf of Dr. Fine.
A. Following that script, the reason that you lost sight in your eye is due to physical interruption of the optical nerve and/or compromise of the blood supply to the optic nerve or to the globe itself.
MR. WOMACK: On behalf of Dr. Fine, let me also object to this doctor giving opinions which I think fall within the scope of an ophthalmologist as opposed to a plastic surgeon.
MR. LARKIN: I join in that objection and move to strike the answer on the same ground.
BY DR. REDLUS [attorney for plaintiffs]:
Q. Doctor, do you have an opinion based on the reasonable medical probability of what was the cause of the physical interruption of the optic nerve?
MR. LARKIN: Same objection. Just calls for a speculation, no facts set forth upon which this witness could give an opinion with any certainty.
MR. WOMACK: Same objection.
The appellees might have conducted a voir dire examination of the expert as to the facts or data he would rely upon for his opinion before the opinion was rendered. Alternatively, they might have cross-examined the witness to require him to specify the facts upon which he relied in support of his opinion. Neither was done here so as to aid the trial court in determining the admissibility of the testimony.[3] However, we need not belabor this point. The record here shows that the hypothetical question which would have formed the basis of appellants' expert witness's opinion comported with the evidence and tracked the criteria for the basis of such an opinion. Santos Wrestling Enterprises, Inc. v. Perez, 367 So.2d 685 (Fla.3d DCA 1979), cert. dismissed, 372 So.2d 470 (Fla. 1979). All of the cases cited by appellees are distinguishable.[4] The trial court erred in excluding all the testimony of Dr. Ballantyne. Because the testimony of the expert was critical, the error was prejudicial.
Plaintiff testified, mostly through an interpreter, that he repeatedly told his doctors he didn't need an operation because his vision was good. His testimony that he had torn up the first consent form given to him is undisputed. He also claims he didn't understand the second document executed *446 by him to be another consent form.[5] Section 768.46(4)(a), Florida Statutes (1979) creates a conclusive presumption that a signed consent is valid but that the presumption is conditioned on the consent meeting the requirements of subsection (3). That subsection provides:
(3) No recovery shall be allowed in any court in this state against any physician licensed under chapter 458, osteopath licensed under chapter 459, chiropractor licensed under chapter 460, podiatrist licensed under chapter 466 in an action brought for treating a patient without his informed consent when:
(a) 1. The action of the physician, osteopath, chiropractor, podiatrist, or dentist in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and
2. A reasonable individual, from the information provided by the physician, osteopath, chiropractor, podiatrist, or dentist, under the circumstances, would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risk and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians, osteopaths, chiropractors, podiatrists, or dentists in the same or similar community who perform similar treatments or procedures; or
(b) The patient would reasonably, under all the surrounding circumstances, have undergone such treatment or procedure had he been advised by the physician, osteopath, chiropractor, podiatrist, or dentist in accordance with the provisions of paragraph (a). (emphasis supplied).
In determining whether the presumption should apply the trier of fact is obligated to consider all the circumstances including the medical procedure proposed, the risks inherent in the procedure, and in that light, the adequacy and reliability of the means chosen to communicate the information to appellant, considering also the known language difficulty.
As to defendant Fine it was error to direct a verdict. A review of the entire record shows sufficient evidence to survive a motion for directed verdict on the issue of informed consent. The testimony of Dandashi, his family members, along with that of Dr. Tenzel and Dr. Ballantyne by deposition, presented sufficient evidence, though conflicting or susceptible of different inferences, tending to prove plaintiff's case. It is only in the absence of any evidence that a court should direct a verdict for a defendant. If the evidence is conflicting, or will admit of different reasonable inferences, or if there is evidence tending to prove the issue, it should be submitted to the jury as a question of fact, and not taken from them to be passed upon by the judge as question of law. Hendricks v. Dailey, 208 So.2d 101 (Fla. 1968); Behar v. Root, 393 So.2d 1169 (Fla. 3d DCA 1981); Laird v. Potter, 367 So.2d 642 (Fla. 3d DCA 1979), cert. denied, 378 So.2d 347 (Fla. 1979); Tiny's Liquors, Inc. v. Davis, 353 So.2d 168 (Fla. 3d DCA 1977).
The directed verdict for defendant Gordon is also improper where the record shows conflicting evidence tending to prove negligence on the part of Dr. Gordon. The fact that Dr. Gordon was under the direction and control of Dr. Fine does not preclude a finding of negligence on the part of Dr. Gordon.
Reversed and remanded for a new trial.
NOTES
[1] Dr. Tenzel's critical testimony is that he saw the justification for surgery in the doctor's charts  diplopia or sinking in the eye, or double vision  and disagreed. As indications for surgery, Dr. Tenzel believed these factors were almost non-existent.
[2] The hospital records include a summary of the operation technique.
[3] See, e.g., Cirack v. State, 201 So.2d 706 (Fla. 1967); Blocker v. State, 92 Fla. 878, 110 So. 547 (1926). We note that the Evidence Code, Sections 90.703, 90.704, 90.705, Florida Statutes (1979), changes Florida law in recognition of the difficulties presented by hypothetical questions. Section 90.705 now permits the expert to render his opinion without prior disclosure of the underlying facts or data. The Sponsors' Note following § 90.705, (6C Fla. Stat. Ann. 229 1979), cites from 2 Wigmore, Evidence, § 686 (3d ed. 1940):

The hypothetical question, misused by the clumsy, and abused by the clever, has in practice led to intolerable obstruction of truth. In the first place, it has artificially clamped the mouth of the expert witness, so that his answer to a complex question may not express his actual opinion of the actual case. .. .
[4] Kautzmann v. Fink, 156 Fla. 628, 24 So.2d 112 (1945) (speed of vehicle not determinable absent facts as to weight or quantity of load); Steiger v. Mass. Cas. Ins. Co., 273 So.2d 4 (Fla. 3d DCA 1973) (psychiatrist testifying as to whether subject accident caused psychiatric disorder without including in hypothetical question the fact of pre-existing psychiatric problem); Nat Harrison Assoc., Inc. v. Byrd, 256 So.2d 50 (Fla. 4th DCA 1971) (hypothetical question calling for opinion as to speed of vehicle at time of accident based on skid mark without essential fact of weight of vehicle); Delta Rent-A-Car, Inc. v. Rihl, 218 So.2d 469 (Fla. 4th DCA 1969), cert. denied, 225 So.2d 535 (Fla. 1969) (hypothetical calling for speed of vehicle objectionable in the absence of measurements and other necessary factors); Young v. Pyle, 145 So.2d 503 (Fla. 1st DCA 1962) (propounding of hypothetical question which includes facts not supported by the evidence); LeFevre v. Bear, 113 So.2d 390 (Fla. 2d DCA 1959) (insufficient facts to support opinion as to speed of vehicle).
[5] We note in the nurses' charts, the duty nurse's comment that Dandashi is "cooperative" but has a "language barrier," which lends additional credence to his claimed lack of informed consent.